UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| J.K., a minor child, by and through his parents and natural guardians, DONALD KAPLAN and THEA LUCILLE NELSON, | Case No. 11-CV-1322 (PJS/JJK) |
| Plaintiffs, | |
| v. | |
| MINNEAPOLIS PUBLIC SCHOOLS (SPECIAL SCHOOL DISTRICT NO. 1); WILLIAM SMITH JR., Principal; CHUL SCHWANKE, Social Worker; and THERESA BATTLE, Associate Superintendent, individually and in their official capacities, | ORDER |
| Defendants. | |

Atlee M. Reilly and Amy J. Goetz, SCHOOL LAW CENTER, LLC, for plaintiffs.

Margaret A. Skelton and Matthew J. Bialick, RATWIK, ROSZAK & MALONEY, P.A., for defendants.

Plaintiff J.K. will begin his senior year of high school this fall.  He attended Southwest High School ("Southwest") in Minneapolis for the past three years and would like to graduate from it.  But defendant Minneapolis Public Schools ("the District") has barred J.K. from attending Southwest because of misconduct that he allegedly committed near the end of his junior year.  The District has informed J.K. that he will be transferred to another high school within the District.  J.K. moves for a preliminary injunction ordering the District to permit him to attend Southwest for the upcoming year.  For the reasons that follow, the Court denies J.K.'s motion.

I.  BACKGROUND[1]

Plaintiff J.K. has been an exemplary student at Southwest.  He has been on the honor roll, has participated in various extracurricular activities, and — until the events underlying this lawsuit — was not subject to any disciplinary action by the school.  Compl. ¶¶ 20-26 [Docket No. 1].

Of particular relevance to this case, J.K. has played on the school's basketball and baseball teams for the past three years.  During the just-completed 2010-2011 school year, J.K. was a member of the varsity squads of both the baseball and basketball teams, and his coaches selected him to be a co-captain of the basketball team during the upcoming 2011-2012 school year.  *Id.* ¶ 25.

This case arises out of an incident that took place in March 2011, while the baseball team was in Florida for a spring-training trip.  According to J.K., one night at the team hotel, while he was innocently wrestling with a teammate named J.O., another teammate named B.S. suddenly and unexpectedly exposed his genitals above J.O.'s face.[2]  J.K. immediately released J.O.  J.K. says that B.S.'s behavior took J.K. by surprise, and that J.K. did not plan, encourage, or condone the incident.  *Id.* ¶ 30.  J.K. says that he was subjected to a similar act, and that J.O. subjected another student to a similar act.  *Id.* ¶ 31.

According to the District, however, J.K.'s account of the incident is inaccurate in many respects.

---

[1]Except as specifically noted, the facts are undisputed.

[2]During the school's investigation of the incident, students referred to B.S.'s action toward J.O. as "teabagging."  Schwanke Aff. ¶ 7 [Docket No. 25].

Defendant William Smith Jr., Southwest's principal, learned in late April 2011 that J.O. had been the victim of some type of harassment during the baseball team's trip to Florida in March.[3]  Smith asked a school social worker, Connie Overhue, to investigate.  Overhue Aff. ¶ 3; Smith Aff. ¶ 5.

Overhue met with J.O. on April 25, 2011.  J.O. told Overhue that he had been teased about his height during the Florida trip but otherwise had not been harassed.  Overhue Aff. ¶ 3. The next day, Overhue met with two of J.O.'s friends.  One friend — a girl who had not been on the trip — said that J.O. had called her from Florida and had sounded upset when they talked. The girl also told Overhue that after the team had returned to school, she heard rumors that a baseball player had put his testicles in J.O.'s mouth, and she saw a baseball player put J.O. in a trash can.  *Id.* ¶ 4.  The second friend — a boy on the baseball team — confirmed that other players had teased J.O. about his height during the Florida trip.  The boy also told Overhue that other players had told him that a teammate had rubbed his testicles on J.O.'s face.  The boy wept while talking to Overhue, apparently because he regretted not doing anything to help J.O.  *Id.*

Overhue met with J.O. for a second time the next day.  She asked J.O. specifically about an "incident involving male genitalia," and J.O. began to cry.  J.O. said that he was not a "snitch" or a "traitor" and that he did not want to talk because he feared retaliation.  But J.O. agreed to signal, by nodding, whether specific individuals were involved in the incident.  J.O.

---

[3]It is not entirely clear from the record how Smith first learned of the harassment. Overhue Aff. ¶ 2 [Docket No. 24]; Smith Aff. ¶ 4 [Docket No. 26] ("The alleged harassment and assault of a student during the March 2011 Southwest High School Florida baseball trip came to my attention on April 22, 2011.").  But it appears that J.O. related the incident to one of his friends, who reported it to her mother, who reported it to a school-district official, who reported it to Smith.  Schwanke Aff. Ex. 1 at 3.

indicated that J.K. and B.S. were involved; he indicated that two other students whose names had come up were not involved.  *Id.* ¶ 5; *id.* Ex. 1 at 2.

Overhue reported her findings to Smith, who interviewed J.O. the same day.  In response to a question from Smith, J.O. said that J.K. had held him down against his will, while B.O. had rubbed his testicles in J.O.'s face.  Smith Aff. ¶ 7.

Smith then interviewed B.S., who confirmed J.O.'s story.  According to B.S., when he, J.K., and J.O., were alone in a hotel room, J.K. held J.O. down while B.S. rubbed his testicles on J.O.'s face.  *Id.* ¶ 8.  B.S. "acknowledged that [J.K.] did not like it, but stated that it 'was no big deal.'" *Id.*

Smith, together with Southwest's athletic director, Ryan Lamberty, then interviewed J.K.  J.K. gave more-or-less the same account of events that he gives in this lawsuit:  J.K. and J.O. were wrestling, J.O. fell on the floor, and B.S. waved his testicles over J.O.'s face.  Smith Aff. ¶ 9; *id.* Ex. 3 at 2.  J.K. told Smith and Lamberty that he, B.S., and J.O. were all laughing and playing around and that J.O. was "okay" with what happened.  Smith Aff. Ex. 3 at 2.

Smith suspended J.K. for five days beginning on April 27, 2011, pending further investigation and a decision about expulsion.  (Smith also took disciplinary action against B.S.)  Smith met with J.K.'s father later that day for about three hours.  Smith Aff. ¶ 10.

The next day, Smith recommended to defendant Chul Schwanke that J.K. be expelled.  *Id.* ¶ 12.  Schwanke is a social worker employed by the District and is responsible for making decisions about expulsion.  *Id.*; Schwanke Aff. ¶ 1-2.

Schwanke followed up by interviewing the parents of J.K. and B.S.  Schwanke Aff. ¶ 2.  The parents told Schwanke that the incident involving J.K., B.S., and J.O. was not an isolated

event; rather, it was but one of several similar events that happened during the baseball team's Florida trip.  Schwanke then decided, after consulting his colleagues, to hire an outside attorney to investigate the incident further.  *Id.* ¶ 3.

The District hired Jeffrey Hassan, a local attorney, to investigate.  *Id.*  Hassan reviewed Smith's and Overhue's written reports of their interviews with J.O., J.K., B.S., and other students.  Schwanke Aff. Ex. 1 at 2.  Hassan then interviewed four school employees: Smith; Overhue; Lamberty; and Jared Mountain, the baseball coach.  *Id.* at 2-13.  Hassan also interviewed numerous students, although he did not interview J.O. because his parents did not make J.O. available.  *Id.* at 2.  Hassan interviewed J.K. in the presence of his parents and an attorney for J.K.  *Id.* at 13.  Hassan interviewed B.S. in the presence of his father.  *Id.* at 21. Hassan also interviewed four other students (three baseball players and the female friend of J.O.'s who had spoken with Overhue in April).

The accounts that B.S. and J.K. gave to Hassan of the incident were consistent with the accounts that they had given to Smith.  *See id.* at 13-16 (report of J.K. interview), 21-22 (report of B.S. interview).  But B.S. provided an important additional detail about the incident.  He said that while J.O. was showering, B.S. and J.K. planned what they were going to do to J.O.  And, pursuant to that plan, after J.O. got dressed and sat on a hotel bed next to J.K., J.K. grabbed J.O. and held him down to enable B.S. to place his testicles near J.O.'s face.  *Id.* at 21.

Hassan summarized his findings in a report dated May 17, 2011.  Based on his investigation, Hassan concluded that it was more likely than not that  B.S. had "engaged in an act that meets the definition of a sexual assault, bullying, and hazing."  *Id.* at 23.  Hassan also concluded that it was more likely than not that J.K. "was an accomplice to the sexual assault,

bullying and hazing." *Id.*  Moreover, Hassan found that — as some parents and students had

alleged — the conduct of B.S. and J.K. toward J.O. "was part of a pattern of hazing behavior

engaged in by many, if not most, of the members of the [Southwest] baseball team." *Id.* at 24.

The District's policy about student-on-student sexual assault requires only that a school

report the assault to the appropriate authorities, which Southwest did.  *See* Minneapolis Pub.

Sch. Policy 5636 (Jan. 29, 2002), *available at* http://policy.mpls.k12.mn.us/uploads/5636.pdf;

Schwanke Aff. Ex. 1 at 22.  But under the District's anti-bullying and anti-hazing policy, the

District must "discipline or take appropriate action against any student . . . who is found to have

violated" the policy.  Minneapolis Pub. Sch. Policy 5201 § II.K (eff. date May 28, 2008),

*available at* http://policy.mpls.k12.mn.us/uploads/5201_Policy.pdf.  Any discipline imposed

under Policy 5201 must "be consistent with the requirements of . . . applicable statutory

authority, including the Minnesota Pupil Fair Dismissal Act, school district policies and

regulations."  *Id.*  A related regulation specifies that the District's "action or intervention" for

bullying or hazing may include, among other things:

> a.      restorative process,
> b.      referral to counseling,
> c.      conferencing,
> d.      warning,
> e.      suspension,
> f.      exclusion,
> g.      expulsion,
> h.      transfer,
> i.      remediation,
> j.      termination or discharge.

Minneapolis Pub. Sch. Reg. 5201A § IV.A.1 (eff. date May 28, 2008), *available at*

http://policy.mpls.k12.mn.us/uploads/5201_A_Regulation.pdf.

Schwanke decided, after reviewing Hassan's report and consulting with defendant Theresa Battle (an associate superintendent within the District), that expelling J.K. would be too harsh.  Schwanke Aff. ¶ 8.  Instead, the District decided, "based upon concern for [J.O.]," to "administratively transfer" J.K. to a different high school under District Policy 5140.  Schwanke Aff. ¶ 9.  Policy 5140 allows for a "Student Special Transfer . . . to address medical, psychological needs of students and victim safety."  Minneapolis Pub. Sch. Policy 5140 § I.A (rev. Oct. 26, 2004), *available at* http://policy.mpls.k12.mn.us/uploads/Revision_to_5140.pdf.

Schwanke spoke with J.K.'s parents on May 19, 2011.  He told them of the District's decision to administratively transfer J.K. and informed them that J.K. could transfer immediately or could finish out the school year by doing his schoolwork at home.  At the time, J.K. had been suspended for 15 school days, and only 15 more school days remained in the year.  J.K.'s parents opted for homebound instruction rather than an immediate transfer.  Schwanke Aff. ¶ 11.

If J.K. is administratively transferred to another high school for the upcoming school year, his high-school transcript will not reflect the reason for the transfer.  *Id.* ¶ 12.  Instead, the transcript will simply show that J.K. attended Southwest for three years and a different school for his senior year.  *Id.*

## II.  STANDARD OF REVIEW

A court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other litigants; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

A preliminary injunction is an extraordinary remedy, and the party seeking the injunction bears the burden of establishing the four *Dataphase* factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). If a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors — irreparable harm, balance of harms, and the public interest — weigh in the party's favor. *See CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) ("[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied . . . ."); *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) ("[A]n injunction cannot issue if there is no chance of success on the merits . . . ."); *Brands v. Sheldon Cmty. Sch.*, 671 F. Supp. 627, 630 (N.D. Iowa 1987).

## III.  DISCUSSION

In this action, J.K. challenges two different actions by the District: (1) the suspension of J.K. from Southwest during the just-completed school year, and (2) the decision to transfer J.K. to a different school for the upcoming school year. Specifically, J.K. contends that the District's actions have violated his right to procedural due process under the Fourteenth Amendment of the United States Constitution, and he seeks relief under 42 U.S.C. § 1983. Compl. ¶¶ 106-07.

For purposes of J.K.'s motion for a preliminary injunction, the Court need only consider J.K.'s claims with respect to the proposed transfer, which J.K. asks the Court to enjoin. Whether J.K. was afforded constitutionally adequate process with respect to his now-completed suspension is an issue for another day.

The Due Process Clause of the Fourteenth Amendment forbids states to "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV,

§ 1.  To prevail on a procedural-due-process claim against the District, J.K. must establish two things.  First, he must show that the District deprived him of a life, liberty, or property interest protected by the Fourteenth Amendment.  Second, he must show that the District deprived him of that interest without providing adequate process.  *See Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000).

In general, property interests are created by state law, not by the United States Constitution.  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").  The Constitution protects a person's state-created property interest only if the person has a "legitimate claim of entitlement" under state law to that interest.  *Goss v. Lopez*, 419 U.S. 565, 573 (1975).

J.K. asserts that the proposed transfer will deprive him of three distinct interests: (1) his property interest in his education; (2) his property interest in participating in interscholastic sports; and (3) his liberty interest in his reputation.  The Court discusses each interest in turn.

A.  *Property Interest in Education*

The Minnesota Constitution requires the state to maintain a system of public schools that is "general and uniform" as well as "thorough and efficient . . . ."  Minn. Const. art. XIII, § 1.  And under Minn. Stat. § 120A.22 subdivision 5, children between the ages of 7 and 16 are required to attend school.  Minn. Stat. § 120A.22 subd. 5.  Accordingly, because Minnesota guarantees an education to students such as J.K., his property interest in a public education is

protected by the Fourteenth Amendment's Due Process Clause.  *See Goss*, 419 U.S. at 574

(holding that because Ohio maintained a school system that it required children to attend, the

state was "constrained to recognize a student's legitimate entitlement to a public education as a

property interest which is protected by the Due Process Clause"); *In re Expulsion of N.Y.B.*, 750

N.W.2d 318, 327 (Minn. Ct. App. 2008) ("Education is a fundamental right in Minnesota, as

well as a property interest protected by the Due Process Clause of the Fourteenth Amendment to

the United States Constitution." (citations omitted)).

J.K. argues that his transfer, which he characterizes as a "disciplinary" transfer rather

than an "administrative" transfer, is a "de facto expulsion."  Pl. Mem. Supp. Mot. P.I. at 10

[Docket No. 9].  Specifically, he argues that "the interests implicated are identical" when a

student is expelled and when a student is transferred under circumstances like those in this case.

*Id.* at 11.  The Court disagrees.

The question, for due-process purposes, is whether J.K.'s transfer from Southwest to a

different high school deprives him of his property interest, under Minnesota law, in a public

education.  As to this question, the purpose of the transfer is irrelevant.[4]  The transfer —

whatever the reason behind it — either deprives J.K. of a property interest in his education, or it

does not.

The Court recognizes (and the District does not dispute) that changing high schools will

be a substantial hardship for J.K.  But to argue that attending a high school other than Southwest

would deprive J.K. of a public education — that is, of *any* public education — is tantamount to

---

[4]The purpose of the transfer *is* potentially relevant to J.K.'s claim that the transfer will
interfere with his liberty interest in his reputation.  J.K.'s claim with respect to his reputational
interest is discussed below.

arguing that all of the high-school students in the District who are not attending Southwest are *themselves* not receiving a public education.  The argument is meritless.  Even if Southwest is the best public high school in the District (as J.K. contends), that does not mean that the students attending the other District high schools — say, the second- or third-best high schools in the District — are not receiving an adequate public education.

Further, although the Minnesota Constitution guarantees students *a* public education, Minnesota has, by legislation, decreed that students lack the very right asserted by J.K. in this case — that is, the right to attend a *particular* public school.  Under Minn. Stat. § 120A.36, titled "School Attendance," "[a]ttendance at a particular public school is a privilege not a right for a pupil."  Minn. Stat. § 120A.36.  It is hard to imagine how J.K. could have a legitimate claim of entitlement under Minnesota law to attend Southwest when Minnesota law unambiguously provides that J.K.'s attendance at Southwest is "not a right."

J.K. asks the Court to ignore § 120A.36 and directs the Court's attention to a District regulation under which students "currently enrolled" in high schools such as Southwest are given "[f]irst priority" for placement in those schools.  Minneapolis Pub. Sch. Reg. 5262A § V.A.1 (eff. date Sept. 15, 2010), *available at* http://policy.mpls.k12.mn.us/uploads/ 5262_a_regulation.pdf.  Even assuming that this regulation provides J.K. with some expectation that he will be able to attend the same high school for four years, this regulation coexists with Policy 5140, which allows for exactly the type of administrative transfer that has frustrated J.K.'s expectation of remaining at Southwest.  Obviously, then, the existence of Policy 5140 qualifies — and reduces — whatever expectation is created by Regulation 5262A.

Moreover, even if Regulation 5262A provided students an absolute guarantee that they could remain at a particular high school for four years, the Court's analysis would not change. After all, the District cannot change a state law through a school-board regulation. As noted, Minn. Stat. § 120A.36 makes clear that the Minnesota Legislature has rejected the very property interest asserted by J.K. here — namely, J.K.'s asserted property interest in continuing his education at Southwest as opposed to some other high school. The District has no authority to nullify an act of the Minnesota Legislature.

The Court recognizes that certain language in *Winegar v. Des Moines Independent School District* supports J.K.'s argument that the Due Process Clause applies to the proposed administrative transfer. 20 F.3d 895 (8th Cir. 1994). *Winegar* said that a public-school teacher who was transferred to a different school after a fight with a student "demonstrated a weighty private interest in retention of his job, his assignment, and his good name that are adversely affected by . . . [his] suspension and punitive transfer." *Id.* at 901.

But for at least three reasons, *Winegar* does not persuade the Court that J.K.'s transfer will deprive him of a state-created, constitutionally protected property interest. First, *Winegar* was decided under Iowa law, and *Winegar* includes no suggestion that Iowa law contains a provision governing teachers' assignments to schools that is analogous to Minn. Stat. § 120A.36. Second, the defendant school district in *Winegar* apparently conceded that the teacher's transfer affected a property interest in his employment and that he was entitled to some kind of process with respect to the transfer. 20 F.3d at 899 ("[T]he parties agree that Winegar has a protected property interest in his employment . . . . Having decided that Winegar has property and liberty interests, we must thus decide what process is due Winegar."), *id.* at 899 n.5 ("Although the

School District concedes that this case involves more than a de minimis deprivation, it argues that because the impact of the deprivation is slight, the process due is lessened."). The District makes no analogous concession in this case. Third, *Winegar* involved employment rather than education and relied on *Perry v. Sinderman*, in which the Supreme Court held that a property interest in employment can arise, as a matter of state contract law, under "an unwritten 'common law'" of a workplace. *Perry v. Sinderman*, 408 U.S. 593, 602 (1972); *Winegar*, 20 F.3d at 899 (citing *Perry*). The Court is not aware of any cases extending *Perry*'s reasoning to cover a student's expectation about the location of his public education.

The Court's holding that J.K.'s transfer to a different high school does not impair his state-created property interest in a public education is consistent with decisions of other federal courts relating to similar transfers of public-school students.

In particular, the Tenth Circuit in *Doe v. Bagan* rejected a student's constitutional challenge to a transfer, saying that it was "obvious . . . that [the student] was not denied his right to public education. He was only denied his request to attend the public school of his choice." 41 F.3d 571, 576 (10th Cir. 1994). Earlier, in *Zamora v. Pomeroy*, the Tenth Circuit rejected a student's due-process challenge to a disciplinary transfer that resulted from the discovery of marijuana in his locker. 639 F.2d 662 (10th Cir. 1981). Although *Zamora*'s reasoning is not entirely clear, *Zamora* said that the student did not suffer "an injury within the framework of the constitution" because, among other things, the record did not support the student's claim that the school to which he was transferred "was so inferior to amount to an expulsion from the educational system . . . ." *Id.* at 670. *Zamora* went on to say that "in the absence of a clear showing that the [challenged transfer] was substantially prejudicial, the [student] lack[s] the

requisite standing to attack the [school's] actions on that ground."  *Id.*  *Zamora* thus seems to stand for the proposition that when a public-school student is transferred to a different school, he can bring a procedural-due-process challenge to the transfer only if the new school is so bad that attending the school is tantamount to receiving no education.[5]

In *Nevares v. San Marcos Consolidated Independent School District*, the Fifth Circuit, citing *Zamora*, held that a student's disciplinary transfer from an ordinary high school to an alternative educational program did not impair the student's entitlement to a public education. 111 F.3d 25 (5th Cir. 1997).  *Nevares* held that the student "[was] not being denied access to public education, not even temporarily.  He was only to be transferred from one school program to another program with stricter discipline."  *Id.* at 26.  Such a transfer did not amount to a "constitutional deprivation actual or threatened . . . ."  *Id.*

*Nevares* leaves open the same possibility left open by *Zamora* — namely, that an interschool transfer may impair a student's constitutionally protected right to an education if the school or program to which the student is transferred is grossly inadequate.  Indeed, after *Nevares*, a district court in the Fifth Circuit held, in *Riggan v. Midland Independent School District*, that "[w]hen assignment to an alternate education program effectively acts as an

---

[5]The Court has not placed a great deal of reliance on *Zamora* — which, of course, is not binding on this Court — because some aspects of *Zamora* are very difficult to understand.  For instance, one paragraph begins, "[o]ur view is that there was no lack of due process in the case at bar."  639 F.2d at 668.  The following paragraph, a single sentence, says:  "The decision here depends on the validity of the seizure rather than procedural sufficiency."  *Id.*  The opinion then proceeds in the next few paragraphs to discuss *not* the validity of the seizure — the very issue that the court had just characterized as determinative — but instead the procedures surrounding the suspension and transfer.  *Id.* at 669-70.  Next, the opinion veers into a discussion of whether the student was deprived of his right to an education, which leads to the conclusion about "standing" quoted in the text.  *Id.* at 670.

exclusion from the educational process, due process rights may be implicated."  86 F. Supp. 2d
647, 655 (W.D. Tex. 2000).  This holding is consistent with dictum from *Buchanan v. City of
Bolivar*, in which the Sixth Circuit said that a student "may not have procedural due process
rights to notice and an opportunity to be heard when the sanction imposed is attendance at an
alternative school absent some showing that the education received at the alternative school is
significantly different from or inferior to that received at his regular public school."  99 F.3d
1352, 1359 (6th Cir. 1996).

In short, federal courts generally agree that "placement in an alternative school does not
implicate procedural due process rights unless there is a showing that the education provided by
the alternative school is substantially inferior."  *Chyma v. Tama Cnty. Sch. Bd.*, No. C07-0056,
2008 U.S. Dist. LEXIS 80177, at *8-9, 2008 WL 4552942, at *3 (Oct. 8, 2008).  J.K. is highly
unlikely to be able to make such a showing with respect to the various high schools to which he
may be transferred.

### B.  *Property Interest in Participating in Interscholastic Sports*

The parties seem to agree that under the relevant rules of the Minnesota State High
School League ("the League"), if J.K. transfers to a school other than Southwest, he will not be
able to participate in varsity interscholastic sports during the upcoming year.[6]  Further, it is

---

[6]The Court is less certain than the parties that the League's bylaws will in fact prohibit
J.K. from playing varsity sports after a transfer.  It is true that the League's transfer rule, Bylaw
111.00, prohibits transfer students from playing varsity sports after a transfer unless the transfer
results from one of various specifically listed circumstances — circumstances that do not include
an administrative transfer.  Minn. State High School League, Official Handbook Bylaw 111.00,
at 22 (2010-2011), *available at* http://www.mshsl.org/mshsl/Publications/code/handbook/
HandbookTOC.htm.  But it is also true that League Bylaw 300.00 establishes a "Transfer
Eligibility Review Process."  The section of Bylaw 300.00 describing this process says:

(continued...)

-15-

undisputed that J.K.'s participation on Southwest's baseball and basketball teams has been a significant part of his high-school experience.  The Court thus has no doubt that being excluded from varsity sports during his senior year would be a hardship for J.K.  The Court finds, however, that J.K. is unlikely to prevail on his claim that the District would violate J.K.'s constitutional rights by transferring him from Southwest and thereby rendering him (because of League rules) unable to play interscholastic sports.

To prevail on this claim, J.K. would have to show two things: (1) that he has a constitutionally protected, state-created property interest in participating in varsity interscholastic sports; and (2) that the District's decision to transfer J.K. would deprive him of that property interest without due process.

_____

[6](...continued)
The purpose of the Application to Appeal a Transfer Eligibility Determination includes, but is not limited to the following circumstances:

1)      documented internal Board of Education policies regarding the movement of students within the school district;

2)      adoption, abandonment, broken home, death of a parent or other circumstances beyond the control of the student; . . .

8)      other conditions not covered above but which may be agreed to by both the Sending and Receiving Schools.

Minn. State High School League, Official Handbook Bylaw 300.00, at 45-46 (2010-2011), *available at* http://www.mshsl.org/mshsl/Publications/code/handbook/HandbookTOC.htm. Bylaw 300.00 at least arguably creates the possibility that, despite Bylaw 111.00, the League and the District could permit J.K. to play varsity sports after an administrative transfer based on one or more of these three provisions.

For purposes of this opinion, however, the Court assumes that J.K. is correct in asserting that League rules will absolutely forbid him to play varsity sports if he is transferred to a new school this coming year.

Whether Minnesota law provides J.K. a property interest in participating in varsity

interscholastic sports is a difficult question.  State and federal courts have, by a wide margin,

rejected the argument that students have a constitutionally protected property interest in

participating in extracurricular activities such as interscholastic sports.[7]  Those courts' decisions

are of limited value in this case, however, because they rely on other states' laws — or, in some

instances, because they erroneously treat the property-interest question as if it were solely a

question of federal constitutional law.[8]  Moreover, some courts have found that other states' laws

_____

[7]*Davenport ex rel. Davenport v. Randolph Cnty. Bd. of Educ.*, 730 F.2d 1395, 1397 (11th Cir. 1984); *Hebert v. Ventetuolo*, 638 F.2d 5, 6 (1st Cir. 1981); *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980); *Albach v. Odle*, 531 F.2d 983, 984-85 (10th Cir. 1976) ("Participation in interscholastic athletics is not a constitutionally protected civil right."); *Hamilton v. Tenn. Secondary Sch. Athletic Ass'n*, 552 F.2d 681, 682 (6th Cir. 1976); *Mitchell v. La. High Sch. Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970); *Okla. High Sch. Athletic Ass'n v. Bray*, 321 F.2d 269, 273 (10th Cir. 1963); *McFarlin ex rel. Hardaway v. Newport Special Sch. Dist.*, 784 F. Supp. 589, 592 (E.D. Ark. 1992) ("[A] student's interest in participating in interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement."), *aff'd on other grounds*, 980 F.2d 1208, 1211 (8th Cir. 1992); *Giannattasio v. Stamford Youth Hockey Ass'n, Inc.*, 621 F. Supp. 825, 829 (D. Conn. 1985); *Dallam v. Cumberland Valley Sch. Dist.*, 391 F. Supp. 358, 362 (M.D. Pa. 1975) ("[T]here exists no constitutionally protected property interest in competing for a place on a high school athletic team.  To hold otherwise would too greatly strain the concept of property."); *Mancuso v. Mass. Interscholastic Athletic Ass'n, Inc.*, 900 N.E.2d 518, 527 (Mass. 2009) ("[T]he right to a public education, even one with a mandatory physical education component, is not synonymous with the right to participate in extracurricular activities, such as interscholastic athletics."*); *Ryan v. Cal. Interscholastic Fed'n — San Diego Section*, 114 Cal. Rptr. 2d 798, 808 (Cal. Ct. App. 2001) ("Neither the California Constitution nor California statutory law contains any provision that entitles students to an absolute right to participate in extracurricular activities and, precisely, in interscholastic athletics.  Absent such support, the opportunity to participate in interscholastic athletic activities is a privilege, not a right or an entitlement of such dignity to warrant due process protection."); *Proulx ex rel. Proulx v. Ill. High Sch. Ass'n*, 466 N.E.2d 620, 623-24 (Ill. App. Ct. 1984); *Adamek v. Pa. Interscholastic Athletic Ass'n*, 426 A.2d 1206, 1207-08 (Pa. Commw. Ct. 1981) (collecting cases and holding that "the student plaintiffs have no property interest in participating in interscholastic sports").

[8]*See, e.g.*, *Albach*, 531 F.2d at 984-85; *Hamilton*, 552 F.2d at 682; *Mitchell*, 430 F.2d at
(continued...)

CASE 0:11-cv-01322-PJS-JJK   Document 44   Filed 07/29/11   Page 18 of 27




*do* provide students a constitutionally protected property interest in participating in interscholastic sports.[9]

Previous decisions from this District are in conflict.  On the one hand, *Peterson v. Independent School District No. 811* held that "no property or liberty interest exists in a student's participation in extracurricular activities."  999 F. Supp. 665, 674 (D. Minn. 1998).  But to support this proposition, *Peterson* cited federal cases from other circuits and did not discuss Minnesota law.[10]  And in distinguishing two cases that suggested that students may have a property right in participating in interscholastic sports (one from this District[11] and the other

---

[8](...continued)
1157-58; *Dallam*, 391 F. Supp. at 361-62.

[9]*Palmer ex rel. Palmer v. Merluzzi*, 868 F.2d 90, 96 (3d Cir. 1989) (Cowen, J., concurring and dissenting) ("The majority implicitly acknowledges that Palmer has a protected property interest in his continued participation in extracurricular activities . . . .  I agree that Palmer has a protected property interest [under New Jersey law] in his continuing participation in [his school's] football program . . . ."); *Kelley v. Metro. Cnty. Bd. of Ed. of Nashville & Davidson Cnty.*, 293 F. Supp. 485, 491-92 (M.D. Tenn. 1968); *Stone ex rel. Stone v. Kan. State High Sch. Activities Ass'n*, 761 P.2d 1255, 1259 (Kan. Ct. App. 1988) ("[W]e respectfully differ from those courts which hold that a student's interest in participating in extracurricular activities is not of constitutional magnitude, is not constitutionally protected, or falls outside the protection of due process." (citations and quotation marks omitted)); *see also Duffley v. N.H. Interscholastic Athletic Ass'n*, 446 A.2d 462, 467 (N.H. 1982) ("[I]nterscholastic athletics are considered an integral and important element of the educational process in New Hampshire.  It follows that the right to participate in them at least rises above that of a mere privilege.  Recognizing this, . . . we hold that the right of a student to participate in interscholastic athletics is one that is entitled to the protections of procedural due process under pt. 1, art. 15 of our State Constitution.").

[10]*See Peterson*, 999 F. Supp. at 674 (citing *Davenport*, 730 F.2d at 1397 (applying Alabama law); *Hebert*, 638 F.2d at 6 (applying Rhode Island law); and *Walsh*, 616 F.2d at 159 (applying Louisiana law)).

[11]*Behagen v. Intercollegiate Conference of Faculty Reps.*, 346 F. Supp. 602, 604 (D. Minn. 1972) (holding that "[the] opportunity to participate in intercollegiate athletics is of substantial economic value to many students" and participation in such athletics is therefore

navigation
(continued...)

from the Middle District of Tennessee[12]), *Peterson* relied heavily on dictum from *McFarlin ex rel. Hardaway v. Newport Special School District*, 980 F.2d 1208 (8th Cir. 1992), an Eighth Circuit case that was based on Arkansas law.

On the other hand, in *Giblin v. Minnesota State High School League*, then-District Judge Murphy held that, under Minnesota law, "eligibility to participate in interscholastic sports is part and parcel of the right to education."  No. 4-81-767, 1982 U.S. Dist. LEXIS 10448, at *7 (D. Minn. Jan. 15, 1982).[13]  *Giblin* noted that the Minnesota Supreme Court "has not explicitly recognized a property right under Minnesota law to participate in interscholastic activities . . . ." *Id.* at *8.  But *Giblin* concluded, based on language from the Minnesota Supreme Court's opinion in *Thompson v. Barnes*, 200 N.W.2d 921 (Minn. 1972), and an opinion of the Minnesota Attorney General, Minn. Op. Att'y Gen. 169-X, 1977 WL 36280 (Sept. 22, 1977), that such a property right exists under Minnesota law.

In *Thompson*, the Minnesota Supreme Court described "participation in interscholastic activities" as "an important and integral facet of the youth's education process . . . ."  200

---

[11](...continued)
entitled to procedural-due-process protection).

[12]*Kelley v. Metro. Cnty. Bd. of Ed. of Nashville & Davidson Cnty.*, 293 F. Supp. 485 (M.D. Tenn. 1968).

[13]The parties did not cite *Giblin*, perhaps because when they briefed their motions, *Giblin* was — for no apparent reason — available only on Lexis, not on Westlaw.

In *Giblin*, Judge Murphy held, in ruling on two students' motion for a preliminary injunction, that the students had a property right in participating in interscholastic sports.  1982 U.S. Dist. LEXIS 10448, at *7-10.  Later, after holding a bench trial, Judge Murphy declined to revisit the property-right question, instead granting judgment to defendants on the basis that "whatever due process rights the plaintiffs might have in these circumstances were not violated; they received all process that was due."  *Giblin v. Minn. State High Sch. League*, No. 4-81-767, 1982 U.S. Dist. LEXIS 13539, at *13 (D. Minn. July 12, 1982).

N.W.2d at 926 n.11.  Notably, *Thompson* supported this assertion by citing *Kelley v.*

*Metropolitan County Board of Education of Nashville and Davidson County*, 293 F. Supp. 485

(M.D. Tenn. 1968).  In *Kelley*, the defendant school board argued that students suspended from

participating in athletics had no right to due process because such participation was a privilege

and not a right.  *Id.* at 491.  *Kelley* rejected this argument, holding that:

> the right or interest that the [plaintiff] students were deprived of by
> virtue of the one year suspension, i.e., the right to engage in
> secondary school athletics, is of such significance and worth as to
> require that the proceedings which resulted in the one year
> suspension conform to the standards of due process.

*Id.* at 492.  *Thompson*'s citation of *Kelley* suggests that the Minnesota Supreme Court would

hold (if the question were squarely presented) that Minnesota law gives students a legitimate

entitlement to participate in interscholastic sports, and that students must therefore receive due

process before they are excluded from such sports.

Further, in an opinion relied on by *Giblin*, the Minnesota Attorney General found that,

for certain purposes, interscholastic sports are "co-curricular" rather than "extra curricular"

activities.  Minn. Op. Att'y Gen. 169-X, 1977 WL 36280 (Sept. 22, 1977); *Giblin*, 1982 U.S.

Dist. LEXIS 10448, at *8.  And in an opinion issued after *Giblin*, the Minnesota Attorney

General said that when "athletic and other extra-curricular activities" are affected by school

discipline, "[d]ue process, with regard to such discipline, must be considered."  Minn. Op. Att'y

Gen. 169-F, 1989 WL 505812, at *3 (Mar. 28, 1989).  The Attorney General went on to say:

> Though there may be differences in other jurisdictions, we also
> note the Eighth Circuit Court of Appeals has stated that:
> "participating in interscholastic sports is a substantial and
> cognizable" interest.  *Brenden v. Independent School District No.*
> *742*, 477 F.2d 1292 (8th Cir.1973).  Additionally, the court in
> *Regents of the University of Minnesota v. N.C.A.A.* 422 F. Supp.

1158, 1161 (D. Minn. 1976), held that university students had a property right in the opportunity to participate in intercollegiate sports which was subject to due process protections. While the Minnesota Supreme Court has not decided this issue, it did note that: "participation in interscholastic activities . . . is today recognized . . . as an important and integral facet of the youth's education process." *Thompson v. Barnes*, . . . 200 N.W.2d 921, 926 n. 11 ([Minn.] 1972).

*Id.*

In light of these authorities, J.K. has a strong argument that, under Minnesota law, his property interest in an education extends to participation in interscholastic sports. But even if J.K. does have a state-created, constitutionally protected property interest in participating in interscholastic sports, he is unlikely to be able to show that the District will impair that right without due process if it transfers him from Southwest.

To begin with, if the right to participate in interscholastic sports is constitutionally protected because it is (in Judge Murphy's words) "part and parcel of the right to education,"[14] then it follows that any limitation on the right to a public education is necessarily a limitation on the right to participate in interscholastic sports as part of that education. And, as noted above, the right to an education in Minnesota does not include the right to be educated at a particular school. *See* Minn. Stat. § 120A.36. If a student has no right to take classes at a particular school, a student likewise has no right to play sports at a particular school. J.K. therefore has no property interest in playing interscholastic sports at *Southwest*; at most, he has a property interest in playing interscholastic sports *somewhere*.

---

[14]*Giblin*, 1982 U.S. Dist. LEXIS 10448, at *7.

This analysis reveals the central reason why J.K. is unlikely to prevail on his sports-based due-process claim: The District — the defendant in this case — is not preventing J.K. from playing sports by transferring him.  The District is preventing J.K. only from playing sports *at Southwest*.

Of course, J.K. asserts that he will be forbidden to play varsity sports at his new school after the transfer.  But if that happens, it will be because of the rules of the League, not because of the transfer.  It is the District that has decided to transfer J.K., but it is the League that has decided to bar transfer students from participating in interscholastic sports at their new schools.

Thus, J.K. could sue the League (and perhaps the District) after he is transferred, seeking the right to participate in varsity sports at his new school.  Indeed, this is precisely the type of claim that was brought by the plaintiffs in *Giblin*.  At the request of the transferred students, Judge Murphy (temporarily) enjoined the League from excluding the students from playing interscholastic sports at the public school to which they had transferred.  1982 U.S. Dist. LEXIS 10448, at *9-10.

But J.K. has not sued the League, and he has not asked this Court to order that he be allowed to play sports at his new school.  Rather, he has asked this Court to enjoin the transfer so that he can play sports at Southwest.  Again, though, J.K. does not have a constitutionally protected right to play sports at Southwest.

Because J.K. is unlikely to show that the District, by transferring him, would impair his property interest in participating in interscholastic sports as part of his education, the Court will not enjoin the transfer on this basis.

### C. Liberty Interest in Reputation

Under well-established law, J.K. has a constitutionally protected liberty interest in his reputation, with an important qualification:  The Due Process Clause of the Fourteenth Amendment does not protect a person's reputation alone.  *See Paul v. Davis*, 424 U.S. 693, 711-12 (1976); *Gunderson v. Hvass*, 339 F.3d 639, 644 (8th Cir. 2003) ("Damage to reputation alone . . . is not sufficient to invoke the procedural protections of the due process clause."). Rather, to make out a reputation-based procedural-due-process claim based on his pending transfer, J.K. must establish that the transfer will inflict both of two types of harm on him: (1) damage to his reputation and (2) a tangible burden of some kind.  *Gunderson*, 339 F.3d at 644.  Such claims are known as "stigma-plus" claims.  *Id.*  The damage to reputation is the "stigma," and the tangible burden is the "plus."

The Court assumes, for purposes of this order, that J.K.'s transfer from Southwest is a sufficiently tangible burden to satisfy the "plus" element of a stigma-plus claim.  Nonetheless, the Court finds that J.K. is unlikely to prevail on his stigma-plus claim because he cannot show that the District has caused him, or will cause him, any stigma by transferring him.

A person's reputation, by its nature, exists in the public sphere, and undisclosed information cannot cause reputational harm.  Thus, in the government-employment context, courts routinely hold that an employee bringing a stigma-plus claim after being fired must show that the government somehow publicized damaging information about the employee.  *See, e.g.*, *Brown v. Simmons*, 478 F.3d 922, 923 (8th Cir. 2007) ("To state a 'stigma plus' claim, [a government] employee must allege: (1) an official made a defamatory statement that resulted in a stigma; (2) the defamatory statement occurred during the course of terminating the employee;

(3) the defamatory statement was made public; and (4) an alteration or extinguishment of a right or legal status." (citations omitted)); *Mascho v. Gee*, 24 F.3d 1037, 1039 (8th Cir. 1994).

The District contends, and J.K. does not deny, that after his transfer, his academic record will simply show that he transferred from one school to another and will not provide a reason for the transfer. Def. Mem. Opp. Pl. Mot. TRO at 20 [Docket No. 23]; Schwanke Aff. ¶ 12 ("There is no reference to an administrative transfer on a student's high school transcript."). Thus, there is no evidence in the record to show that in transferring J.K., the District will communicate any stigmatizing information that will harm J.K.'s reputation.

Indeed, in arguing for an injunction to prevent the transfer, J.K. implicitly acknowledges that the District has not communicated, and will not communicate, any stigmatizing information by transferring him. J.K. asks the Court to enjoin the transfer so that he can "return to [Southwest] to rehabilitate his reputation." Pl. Reply Mem. at 16 [Docket No. 31]. But if J.K.'s reputation has been tarnished at Southwest, that tarnish resulted from his suspension and the surrounding events, not from his upcoming transfer. There is no evidence that the transfer will create any *additional* stigma — that is, stigma that has not already been created by the suspension.

J.K.'s claims with respect to the suspension are backward-looking and are not now before the Court. Further, to succeed on his claim that his suspension deprived him of his liberty interest in his reputation, J.K. will have to show that the District caused damage through a communication that *it* made about that suspension; the District cannot be held responsible for the statements of others, such as students and their parents. In any event, the Constitution does not require the District to allow J.K. to stay at Southwest to repair his reputation, and a transfer that

-24-

prevents him from doing so does not amount to the communication by the District of stigmatizing information.

Because the District is not communicating any stigmatizing information in connection with J.K.'s transfer, J.K. would have to rely on the doctrine of defamation by "compelled self-publication" to show reputational harm. Under this doctrine, even if a defendant does not communicate a defamatory statement to anyone, "if a defamed person was in some way compelled to communicate the defamatory statement to a third person, and if it was foreseeable to the defendant that the defamed person would be so compelled, then the defendant could be held liable for the defamation." *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 886 (Minn. 1986).

For two reasons, the Court finds that J.K. cannot use the compelled-self-publication doctrine to satisfy the stigma portion of his stigma-plus claim. First, J.K. has cited no case — and the Court has found none — in which the compelled-self-publication doctrine was applied in the context of a federal constitutional claim for damage to a person's liberty interest in his reputation. Given that state courts are sharply divided over whether to apply the doctrine to state-law defamation claims[15] — and given that various state legislatures, including Minnesota's,

---

[15]*See generally White v. Blue Cross & Blue Shield of Mass.*, 809 N.E.2d 1034, 1036-38 (Mass. 2004) (collecting cases).

have specifically rejected the doctrine by statute[16] — the Court declines to extend the doctrine to federal constitutional claims.

Second, even if the Court held that compelled self-publication could satisfy the stigma portion of a stigma-plus claim, J.K. cannot show that he is, in fact, compelled to self-publish any negative information about his transfer.  The District characterizes the transfer as administrative, not disciplinary.  Thus, if J.K. is asked — by colleges to which he applies or anyone else — whether he has ever been disciplined, he will not have to reveal the transfer in response.  *See* Def. Mem. Opp. Pl. Mot. TRO at 20 ("[J.K.] can legitimately avoid describing the administrative transfer on college applications because the administrative transfer is not a disciplinary act."); Schwanke Aff. ¶ 12.

### III.  CONCLUSION

The Court has no doubt that J.K. will suffer substantial hardship if he is transferred to a new school.  But federal courts cannot remedy every hardship.  In this case, the Court finds that J.K. is so unlikely to prevail on the merits of his procedural-due-process claims that, even if he

---

[16]*See* Minn. Stat. § 181.962 subd. 2 (barring compelled-self-publication defamation claims based on employee's review of own personnel file); Minn. Stat. § 181.933 subd. 2 (barring compelled-self-publication defamation claims based on employee's request of reason for discharge in writing); Colo. Rev. Stat. § 13-25-125.5 ("No action for libel or slander may be brought or maintained unless the party charged with such defamation has published, either orally or in writing, the defamatory statement to a person other than the person making the allegation of libel or slander.  Self-publication, either orally or in writing, of the defamatory statement to a third person by the person making such allegation shall not give rise to a claim for libel or slander against the person who originally communicated the defamatory statement."); Or. Rev. Stat. § 30.178(2) ("A civil action for defamation may not be maintained against an employer by an employee who is terminated by the employer based on a claim that in seeking subsequent employment the former employee will be forced to reveal the reasons given by the employer for the termination.").

will suffer irreparable harm from the transfer, and even if that harm outweighs the public interest in transferring him, a preliminary injunction is not warranted.

The Court emphasizes the narrow scope of this decision, which relates only to J.K.'s request for prospective relief.  The Court expresses no opinion on whether J.K. received constitutionally adequate process with respect to his completed suspension.  That issue remains to be litigated.  Likewise, the Court expresses no opinion on whether, in the abstract, the District acted wisely or fairly when it decided to transfer J.K. because of his involvement in the incident in Florida.  That is none of the Court's business.  The Court simply holds that no basis exists under the United States Constitution to enjoin the District from transferring J.K. to a different school for the upcoming school year.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT the motion of plaintiff J.K. for a preliminary injunction [Docket No. 6] is DENIED.

Dated: July 29, 2011                          s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge